FILED
JAMES BONINI
CLERK

05 OCT -4 PM 4: 54

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| PO LEUNG CHEUNG, On Behalf of Himself and All Others Similarly Situated ) ) ) | No. **C2 05 913** |
| Plaintiff, ) ) | Judge **JUDGE MARBLEY** |
| ) | |
| vs. ) | |
| ABERCROMBIE & FITCH CO., MICHAEL S. JEFFRIES, ROBERT S. SINGER, DAVID L. LEINO, DIANE CHANG and LESLEE K. O'NEILL, ) ) ) ) ) | **MAGISTRATE JUDGE KING** |
| Defendants. ) ) ) | DEMAND FOR JURY TRIAL |

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
GEOFFREY J. MOUL
BRIAN K. MURPHY
1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
655 Broadway, Suite 1900
San Diego, CA 92101-4297
Telephone: 619/231-1058
619/231-7423 (fax)

## INTRODUCTION

1.     This is a securities class action on behalf of purchasers of Abercrombie & Fitch

Company ("Abercrombie" or the "Company") publicly traded securities during the period from

June 2, 2005 to August 16, 2005 (the "Class Period"), against Abercrombie and certain of its officers

and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     Abercrombie is retailer operating four "brand concepts" of "casual luxury" goods and

apparel.  Abercrombie merchandise is sold in retail stores throughout the United States, through

catalogs and on Company-owned Web sites and is targeted at four specific age demographics

through four brands:  Abercrombie & Fitch, abercrombie, Hollister Co. and RUEHL.

3.     The Company's fiscal year commences February 1st.  During February and

March 2005, defendants made a series of express promises that Abercrombie was continuing to

report the high margins and earnings achieved during the 2004 holiday season because it had

purportedly "eliminated" its reliance on profit-dimishing promotional sales.  Instead of focusing on

transaction volume, Abercrombie differentiated itself amongst other apparel distributors by

promising it was rigorously maintaining a high price/high margin sales model.  Purportedly based

on this sales model, coupled with internal sales forecasts, during March 2005 defendants attended

investment conferences held by Bear Stearns and Merrill Lynch and made fiscal 2005 earnings

projections of $2.80-$3.00 per share, or approximately $0.70-$0.75 per share on a quarterly basis.

4.     The Class Period commences June 2, 2005, more than one month into the Company's

second quarter 2005 ("Q2 05").  Between June 2, 2005 and August 16, 2005, defendants caused

Abercrombie's shares to trade at artificially inflated levels by concealing that its business had

deteriorated and as a result, its previously issued earnings projections were grossly overstated.

Despite defendants' earlier promises, during May and June 2005 the Company held an extended

promotional sale under the guise of moving out older product lines to make room for newer lines,

which permitted defendants to make the net sales and comparable store sales figures the market expected for May and June 2005.

5.      Defendants' positive statements had their intended effect and the Company's stock price spiraled to a Class Period high of $73.14 on July 7, 2005. Knowing the earnings projections they made in February and March 2005 were fresh in the minds of investors – especially with the phenomenal sales reports for May and June 2005 – and that the Company's stock price would crash once the Company's actual earnings results were revealed, during a very short period between June 2, 2005 and July 15, 2005 Abercrombie's senior executives sold approximately 1.9 million shares of the Company's stock at inflated prices, pocketing approximately $137 million in proceeds. Abercrombie's Chairman and Chief Executive Officer ("CEO") Michael S. Jeffries ("Jeffries") personally accounted for the majority of the stock sales, selling over 1.78 million shares between June 2, 2005 and July 15, 2005 and receiving over $127.8 million in proceeds.

6.      Following a moderate stock price decline on August 4, 2005 when Abercrombie's actual July 2005 sales results – depressed by the huge May-June promotional activities – were reported, the Company's stock price plummeted on August 16, 2005, when Abercrombie released its Q2 05 financial results. Instead of reporting $0.70-$0.75 per share in earnings, the Company reported $0.63 per share in earnings on lower than expected margins. The Company's stock price plunged to a price approximately 20% lower than its Class Period high, erasing over $1.2 billion in market capitalization. Meanwhile, the Company's insiders pocketed over $137 million in insider trading proceeds through sales that were suspicious both in terms of amount and timing.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act.

8.      Venue is proper pursuant to §27 of the 1934 Act as defendant Abercrombie and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District, and the Company's principal executive offices are in New Albany, Ohio, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

9.      Plaintiff Po Leung Cheung purchased Abercrombie securities as detailed in the attached Certification and was damaged thereby.

10.     Defendant Abercrombie is a specialty retailer of casual luxury goods and apparel, operating retail stores throughout the United States and selling through catalogs and the Internet. The Company's headquarters are located at 6301 Fitch Path, New Albany, Ohio.  As of September 2, 2005, the Company had over 87.5 million shares issued and outstanding which trade on the New York Stock Exchange under the ticker symbol "ANF."

11.     Defendant Michael S. Jeffries ("Jeffries") is, and was at all times relevant hereto, Chairman and CEO of Abercrombie.  Between June 2, 2005 and July 15, 2005, Jeffries sold over 1.78 million shares of Abercrombie stock at an average price of $70 per share receiving proceeds exceeding $127.8 million.

12.     Defendant Robert S. Singer ("Singer") was, at times relevant hereto, President and Chief Operating Officer ("COO") of Abercrombie.  Singer resigned his position at Abercrombie on August 29, 2005.  On June 2, 2005 Singer sold 37,500 shares of Abercrombie stock at an average of $62 per share receiving over $2.33 million in proceeds.

13.     Defendant David L. Leino ("Leino") is, and was at all times relevant hereto, Senior Vice President-Director of Stores of Abercrombie.  On June 2, 2005 Leino sold 92,347 shares of Abercrombie stock at an average price of $64.56 per share, receiving proceeds of approximately $5.9 million.

- 3 -

14.     Defendant Diane Chang ("Chang") is, and was at all times relevant hereto, Executive Vice President-Sourcing of Abercrombie.  Between June 3, 2005 and June 6, 2005, Chang sold 10,161 shares of Abercrombie stock at an average price of $65.15 per shares receiving proceeds of over $661,339.

15.     Defendant Leslee K. O'Neill ("O'Neill") is, and was at all times relevant hereto, Executive Vice President-Planning and Allocation of Abercrombie.  On June 6, 2005, O'Neill sold 6,298 shares of Abercrombie stock for $64.80 per share receiving $408,110 in proceeds.

16.     The individuals named as defendants in ¶¶11-15 are referred to herein as the "Individual Defendants."  They are liable for the false and misleading statements set forth at ¶¶44-46.

## DEFENDANTS' SCIENTER

17.     Defendants are Abercrombie, its CEO/Chairman, its former COO/President, and three top level Vice Presidents.  Each of these executives, by virtue of their high-level positions with Abercrombie, directly participated in the management of Abercrombie, was directly involved in the day-to-day operations of Abercrombie at the highest levels and was privy to confidential proprietary information concerning Abercrombie and its business, operations, products, growth, financial statements and financial condition and was aware of or deliberately disregarded that the false and misleading statements made by and regarding the Company were still alive in the market when they sold stock at inflated prices.  Because of their managerial positions with Abercrombie, each had access to the adverse undisclosed information about Abercrombie's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

18.     Each Individual Defendant was personally familiar with the quality of the Company's projected earnings and the deleterious effect the inventory build up and big promotional markdowns

would have on gross margins because they monitored Abercrombie's revenue and closely monitoring the performance of Abercrombie's operations via reports from Abercrombie's finance department, which were generated and provided to them on a regular basis. The reports summarized the Company's sales practices, inventory levels and promotional sales results. As a result of their monitoring, each Individual Defendants was aware that Abercrombie would be unable to meet projected earnings in light of the massive markdowns and clearance sales. Nonetheless, between June 2, 2005 and July 15, 2005, in violation of his or her duty to "abstain or disclose," the Individual Defendants disposed of the following shares at artificially inflated prices:

| INDIVIDUAL DEFENDANT | SHARES SOLD | AVERAGE PRICE | TOTAL PROCEEDS |
|---|---|---|---|
| JEFFRIES | 1.78 million | $70.00 | $127.8 million |
| SINGER | 37,500 | $62.00 | $2.33 million |
| LEINO | 92,347 | $64.50 | $5.9 million |
| CHANG | 10,161 | $65.00 | $661,339 |
| O'NEILL | 6,298 | $65.00 | $408,110 |
| TOTAL | 1.93 million | | $137 million |

## BACKGROUND

19.    Abercrombie is a casual luxury retailer of men's, women's and children's goods and apparel which was spun off from the Limited beginning in 1996 with its initial public stock offering. Abercrombie operates four distinct lines of goods and apparel targeted at four age demographics: Abercrombie & Fitch (college age), abercrombie (pre-teens), Hollister (high-school) and RUEHL (post-college/business casual).

20.    Following the 2004 holiday season, by early 2005 Abercrombie had raised its average unit retail sales price and was reporting high profit margins. Abercrombie represented to investors that its high margin and high price approach differentiated it from its competition, and the market attached a premium to Abercrombie's stock on that basis.

21.    As part of its high price/high margin strategy, defendants told investors that Abercrombie – unlike other apparel sellers – had "eliminated" its reliance on promotional sales, permitting it to maintain high profit margins and earnings on its 2005 sales.  Meanwhile, defendants secretly knew the Company's inventories were burgeoning, having dramatically grown throughout Q1 05, as the Company was unable maintain the higher sales level achieved during the 2004 holiday season.  By spring 2005, despite their earlier promises to the contrary, the Company would be forced to hold a more than month-long clearance sale – dramatically slashing prices on current inventory – in order to meet Wall Street's and its own sales and earnings targets.

**Abercrombie's Focus on High Margins**
**and "Elimination" of Promotional Sales**

22.    Defendants told investors that a key element of the Company's merchandising strategy was to sell at *increased prices by eliminating promotional sales* in order to, according to Singer, give "the customer a sense of the value of the product . . . . to identify with."  Jeffries said that "*we will not be promotional businesses*"  Singer said that "[w]e put our best merchandise front and forward and *we have eliminated basically all promotions from our stores* and this absolutely distinguishes us from most of the competitors operating in the American mall environment."  By purportedly eliminating promotional sales from its business model in order to maintain high retail prices and profit margins, defendants intentionally attempted to differentiate Abercrombie to investors by promising high average unit retail and high margins rather than solely relying upon transaction volumes like its competitors.  Singer explained that after steadily increasing sales volume in 2004, "what you see [in Q1 05] is that we have more transactions in product with higher unit prices . . . I think *that's what we're totally focused on, the dollars rather than the number of transactions*."

23.    Abercrombie's reported Q4 04 and Q1 05 financial results portended that its high margin strategy was succeeding and defendants raised the Company's earnings guidance for fiscal

2005, commencing February 1, 2005, to $2.80 to $3.00 per share. During February 2005, defendants stated they would cease providing quarterly financial guidance, forcing the investment community to spread the annual earning guidance across four quarters, equating to approximate diluted EPS guidance of $0.70-$0.75 per quarter. In fact, the First Call consensus of analyst EPS expectations for the Q2 05, based on defendants' positive statements, earlier promises and reported high May and June 2005 retail sales, was $0.69 per share.

24. At a Banc of America Securities Consumer Conference held in March 2005, Singer reported that Abercrombie "had an excellent fourth quarter" because *the Company was "able to obtain better initial margins"* by procuring products at a lower cost and leveraging its pricing power through price increases and *"by being much less promotional," resulting in "fewer markdowns."* Singer similarly reported during Abercrombie's Q1 05 earnings conference call that a *"key driver* of our increased sales was the significant increase in average unit retail . . . derived from the ever higher quality of our product and the *elimination of promotional activity, as well as increased unit sales of higher priced items,* in particular denim." During the same conference call, Jeffries told investors that *"by eliminating promotional activity,* we have both enhanced our brand's image . . . *while also improving sales margins.* These characteristics clearly differentiate us from the competition." Jeffries concluded his prepared remarks on the call by assuring investors that Abercrombie would "seek improved quality and fashion while *maintaining our high gross margins."* Abercrombie's share price increased throughout Q4 04 and into Q1 05 to close at $58.51 on May 16, 2005, up more than 25% from its close at $42.00 when Abercrombie released its Q3 04 results.

**Inventory Over-Loads**

25. By the time of the Company's May 17, 2005 earnings conference call, Abercrombie's inventories had increased 56% per gross square foot over the prior year and defendants' high

price/high margin business model was failing to clear those inventories. In fact, the Company's denim inventories were sitting at more than twice their historical levels.

26.   Secretly, defendants knew the Company's inventory growth had outstripped projected sales based on the Company's own internal forecasting. Abercrombie's officers were secretly attempting to cancel orders with the Company's denim vendors to prevent further increasing the Company's inventory glut.

**Abercrombie Reports Surging Sales in May and June 2005 While Prolonging a Massive Clearance Sale**

27.   In late May 2005, just one week after explaining to investors and analysts that Abercrombie was projecting strong Q2 05 financial results, Abercrombie began a massive clearance sale that ran until late June 2005. According to defendants, the month-long sales promotion, which occurred much earlier than the Company's traditional annual pre-back to school sale, was purportedly timed to allow Abercrombie to "be able to enter the back half of the year positioned with less transitional merchandise." In reality, defendants had been forced to do the very thing they promised investors they would not do: they were using promotional sales and markdowns to make their sales targets and to move current inventory.

28.   Defendants' ploy worked. Abercrombie's comparable same store sales – one of the leading retail indicators – increased more than 40% over the prior year during the last week in May 2005 permitting Abercrombie to beat market expectations in this crucial category for the month.

29.   However, by embarking on a month-long clearance sale promotion, Abercrombie significantly undercut the high margins that it had represented differentiated the Company from its competitors. The massive May-June sales would also materially diminish July sales. To mislead the investing public and temporarily obscure the fact that Abercrombie was slashing prices to unload its bloated inventory, Abercrombie inexplicably created and reported a new sales metric in its

- 8 -

June 2005 monthly sales report for a single product: high margin denim. Defendants would later admit the figure was provided as part of an effort to comfort investors, after an analyst privately raised concerns about rising denim inventories. Without explanation or precedent in any of its previous monthly releases, Abercrombie reported that "Total Company denim sales increased 166%" during May 2005 causing Abercrombie's stock to immediately spiral 10% – from $57.99 to $65.00 per share. CIBC World Markets reported that the Company's "166% increase in total denim sales said teens are pounding on its pricier styles." Wall Street Strategies reacted by "adjusting our 2Q 05 and FY 05 EPS projections to reflect *greater sales of high margin denim offerings*."

30.     Buoyed by defendants' continued reports of strong sales in high margin denim products throughout the Class Period, Abercrombie's stock reached a Class Period high of $73.14 on July 7, 2005, based on the market's justifiable expectation that Abercrombie's high sales would pave the way for the high earnings the investment community had been led to expect.

**Insiders Sell Hundreds of Millions of Dollars of Shares**

31.     Between June 2, 2005 and July 15, 2005, Jeffries alone sold 1.78 million shares for over $127 million in proceeds. In fact, beginning July 7, 2005, the same day that Abercrombie released its June 2005 monthly sales report, and continuing over the following week, Jeffries sold more than 1.39 million shares at or near the stock's all-time high price and pocketed more than $101 million. The following week, Jeffries sold 236,000 shares at nearly $70 per share and pocketed almost $16 million more. Jeffries' stock sales were perfectly timed – he sold at and/or near Abercrombie's all-time high share price.

32.     On June 2, 2005, President and COO Singer exercised options for 37,500 shares and immediately sold the shares for a profit of $1,042,500. The trade was unusual in size and out of line with Singer's historical trading practices.

33. Three other Abercrombie Vice Presidents sold millions of dollars worth of their shares between June 2, 2005 and June 6, 2005.

34. In essence, in order to prime the market before selling millions of dollars worth of their own personal shares, defendants drove up the price of Abercrombie's stock by leading the market to believe Abercrombie was experiencing strong sales volume *and* continued high margins. At the time of the insider selling, statements made by defendants in February and March 2005 regarding Abercrombie's commitment to high price, high margin sales were very much alive in the market. Defendants knew but did not disclose to investors that Abercrombie's inventories had grown too large, could only be sold by slashing prices and that doing so would significantly undercut the Company's margins. When defendants moved up Abercrombie's annual summer sale into late May 2005 and extended the sale into late June 2005 to unload its bloated inventories, the promotion both flattened July 2005 sales and undercut Abercrombie's ability to maintain the high margins and earnings that Jeffries and Singer had repeatedly promised the market would be the prime drivers of Abercrombie's success.

**Abercrombie's Stock Collapses**

35. On August 4, 2005, Abercrombie released its monthly sales report for the month of July 2005. Comparable store sales increased 22%, but Abercrombie fell materially short of the consensus market expectation of a 28.7% increase. The sales report prompted a sell-off and Abercrombie shares declined from their close of $70.24 on August 3, 2005 to $63.05 by August 5, 2005.

36. When Abercrombie released its actual Q2 05 financial results on August 16, 2005 – drastically missing market expectations by reporting Q2 05 EPS of only $0.63, well below the market consensus expectation of $0.69 – the Company's stock price precipitously declined. Analysts uniformly attributed Abercrombie's failure to meet market expectations to *lower-than-*

- 10 -

*expected gross margins* that were due in large part to increased markdowns associated with the May-June 2005 clearance sale. Abercrombie's share price plummeted from $63.55 on August 15, 2005 to close at $58.85 on August 17, 2005 – approximately 20% lower than the Company's Class Period high. Meanwhile, over $1.2 billion in market capitalization simply vanished.

## FALSE AND MISLEADING STATEMENTS

### Pre-Class Period False Statements

37. On February 15, 2005, Jeffries, Singer, Sue Riley (Abercrombie CFO) ("Riley") and Tom Lennox (an Abercrombie director)("Lennox") participated in the Abercrombie Q4 04 conference call for analysts and investors. Singer stated: "We will not be promotional businesses . . . . This is a really critical strategy for us to separate ourselves from the competition . . . to train a customer to buy goods at regular price."

38. On March 8, 2005, Abercrombie participated in a 2005 Bear Stearns investor conference. During the conference, as to "Performance Objectives," defendants listed "Maintain[ing] high profit margins" as one of their top two objectives. As to the Company's "Fourth Quarter 2004 Highlights," defendants highlighted the Company's "25% operating margin" and "EPS increase of 19% to $1.15 per share." As to the Company's "2005 Outlook," defendants published the following glowing projections, including EPS of $2.80 to $3.00 per diluted share:



2005 Outlook
- New Store Growth
  - 18 Abercrombie & Fitch, 3 abercrombie, 55 Hollister & 4 RUEHL
- Conversions
  - 3 Abercrombie & Fitch to Hollister
  - 5 abercrombie to Hollister
  - 1 Abercrombie & Fitch to RUEHL
- Total square footage is expected to by approximately 9% during fiscal 2005
- We expect total capital expenditures to be between $225 million and $250 million for fiscal 2005
- Profit expectations: Assuming 20% sales growth, EPS is expected to be in the range of $2.80 to $3.00 per diluted share (excluding the implementation of FAS 123R)

39.     On March 17, 2005, Singer gave a presentation to the Banc of America Securities

Consumer Conference.  Singer stated:

> . . . I'm going to talk about certain aspects essential to management of our
> brands.  First and foremost is the way we merchandise.  We have adopted a policy
> to be absolutely non-promotional in our stores.  We put our best merchandise front
> and forward and we have eliminated basically all promotions from our stores and this
> absolutely distinguishes us from most of the competitors operating in the American
> mall environment right now.

*     *     *

> So . . . financial highlights . . . .  There's been great attention paid to getting
> product at a lower cost and being able to . . . [sic] also in terms of pricing power and
> we have increased our prices.  Secondly, by being much less promotional we've had
> fewer markdowns and, therefore, we were able to achieve a better maintain margin
> [sic] . . . .

*     *     *

> It is not an association that at this brand I can only pay this much and I think
> as you move into that world and you stop being promotional you attract more and
> more people who come in, look at [the merchandise] and say, "Yes, this is worth it.
> I will pay for it."

> . . . I think it's absolutely critical, we can charge a higher price . . . .  And the
> customer has to be able to perceive that value.  It's absolutely essential.

40.     On March 22, 2005, Abercrombie presented at the Merrill Lynch Retailing Leaders

and Household Products & Cosmetics Conference.  Again, "Maintain[ing] high profit margins" was

listed as one of their primary "Performance Objectives"  and the same 2005 projections were

repeated:  "Profit expectations: Assuming 20% sales growth, EPS is expected to be in the range of

$2.80 to $3.00 per diluted share."

41.     On May 17, 2005, the Company issued a press release entitled "Abercrombie & Fitch

Reports First Quarter Sales and Earnings."  Net income was $40.4 million, or $0.45 a share, on gross

sales of $546.8 million, when analysts polled by Thomson First Call had only been looking for a

profit of $0.42 a share.  The press release quoted Jefferies stating:

"Our outstanding results this quarter reflect the success of our strategy. We continue to focus on achieving the highest quality products in the casual sector. I am very pleased with the improvement we have made in our organization both in merchandising where we have focused on building great strength in each category across our brands, as well as in the stores where our investment in additional staff and management hours as well as training have contributed to substantial improvements in store productivity. We believe we are well positioned for continued strong performance as the year progresses."

42.    On May 17, 2005, Jeffries, Singer and Lennox participated in Abercrombie's Q1 05 earnings conference call for analysts and investors to discuss the past quarter's results and their expectations for the upcoming Q2 05:

(a)    Singer stated:

*A key driver of our increased sales was the significant increase in average unit retail of 23% over last year's first quarter.* This increase derived from the ever higher quality level of our product and *the elimination of promotional activity*, as well as increased unit sales of higher priced items, in particular denim.

\* \* \*

I think that basically what you see [in Q1 05] is that we have more transactions in product with higher unit prices, particularly in the denim. And the other thing is that, I think *by having the lower promotional expense, we have more sales dollars for fewer transactions* . . . . [A]ll the businesses have shown remarkable growth, and that's in dollars and we're doing and I think that's what *we're totally focused on, the dollars rather than the number of transactions.*

(b)    Jeffries stated:

*[B]y eliminating promotion[al] activity, we have both enhanced our brand's image as the premium casual brand in each target age category while improving sales margins.* These characteristics clearly differentiate us from the competition . . . . We continue to seek improved quality and fashion while *maintaining our high gross margins*.

43.    The statements set forth at ¶¶37-42 were alive, uncorrected and reflected in the market price of Abercrombie's stock throughout the Class Period. These statements were false and misleading because they concealed the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make the statements made during the Class Period not misleading, including the following:

- 13 -

(a)     Abercrombie abandoned its business strategy of charging high prices, sustaining high margins and engaging in only limited promotional selling when it began the clearance sale and attendant markdowns in May 2005 and continued the sale into late June 2005 (the "promotional activities").

(b)     Abercrombie's promotional activities were dramatically undercutting its profit margins.

**Class Period False Statements**

44.     On June 2, 2005, Abercrombie released its May 2005 sales report in a press release entitled "Abercrombie & Fitch Reports May Sales Increase of 43%; Comparable Store Sales Increase 29%." The Company's June 2, 2005 press release included the new denim sales metric –never again to be repeated – stating that "*[t]otal Company denim sales increased 166%.*" The press release also stated that "*[t]otal Company net sales increased 43%,*" and reported "*a net sales increase of 35% to $705.8 million from $523.4 million last year,*"while concealing that those were not the higher margin sales the market had built into its sales projection models but instead would contribute to the Company's disappointing Q2 05 results.

45.     On July 7, 2005, Abercrombie released its June 2005 sales report in a press release entitled "Abercrombie & Fitch Reports June Sales Increase of 52%; Comparable Store Sales Increase 38%." The June 2005 results marked the Company's tenth straight month of same-store sales increases and more than doubled Wall Street's forecast for a monthly boost of 24.2 % according to a Thomson Financial survey. In relevant part, the press release disclosed that "*Total Company net sales increased 52%* and "*net sales of $221.6 million for the five-week period ended July 2, 2005, a 52% increase over last year's net sales of $146.1 million for the five-week period ended July 3, 2004.*" However, the release concealed that the revenues were not comprised of the

higher margin sales the market had built into its sales projection models and instead would contribute to the Company's disappointing Q2 05 results.

46. On August 4, 2005, Abercrombie released its July 2005 sales report in a press release entitled "Abercrombie & Fitch Reports July Sales Increase of 33%; Comparable Store Sales Increase 22%." In relevant part, the press release disclosed that *[t]otal Company net sales increased 33%* and "*a net sales increase of 38% to $1.118 billion from $813.3 million last year*," but concealed that those were not the higher margin sales the market had built into its sales projection models and instead would contribute to the Company's disappointing Q2 05 results.

47. The statements set forth at ¶¶44-46 were alive, uncorrected and reflected in the market price of Abercrombie's stock during the Class Period. The statements were affirmatively false and misleading in failing to disclose the following facts which were then existing, known to or recklessly disregarded by defendants to be false, and necessary to be disclosed to make defendants' earlier statements – then still alive in the market – not misleading, including the following:

(a)     Abercrombie had abandoned its business strategy of charging high prices, sustaining high margins and "eliminating" promotional selling when it engaged in the May-June 2005 promotional activities.

(b)     Abercrombie's promotional activities were significantly undercutting the profit margins the market was justifiably relying upon to meet the Q2 05 earnings targets defendants themselves had set and assisted analysts in setting.

(c)     The earnings on Abercrombie's increased sales of previously high-margin denim products would be reduced by the Company's promotional activities.

(d)     Abercrombie had been forced to dump bloated Q1 05 inventories at significant discounts.

- 15 -

(e)    The May-June 2005 promotional sales were not designed to clear "transitional" inventory to make room for the Company's new lines, but were instead required to unload Abercrombie's current inventory that was unsaleable at higher prices.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Abercrombie publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Abercrombie and their families and affiliates.

49.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Abercrombie had more than 87.5 million shares of stock outstanding, owned by thousands of persons.

50.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    The extent of damage sustained by Class members and the appropriate measure of damages.

## LOSS CAUSATION/ECONOMIC HARM

51.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Abercrombie's stock price and operated as a fraud or deceit on Class Period purchasers of Abercrombie stock by misrepresenting the Company's business success and future business prospects.  When defendants' falsehoods, misrepresentations and omissions were disclosed and became apparent, Abercrombie's stock price fell precipitously as some of the prior artificial inflation came out of the stock.  As a result of their purchases of Abercrombie stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

52.     Defendants' false and misleading statements and omissions had the intended effect and caused Abercrombie's stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $73.14 on July 7, 2005, before collapsing to $58.85 on August 17, 2005 – a 20% decline.

53.     On August 4, 2005, Abercrombie released sales figures that were significantly below expectations.  The partial disclosure of Abercrombie's false and misleading statements and omissions caused some of the artificial inflation to come out of the stock.  Then, on August 16, 2005, Abercrombie released its Q2 05 financial results, including its material earnings miss.  The disclosure of the results revealed Abercrombie's false and misleading Class Period statements and omissions causing more of the artificial inflation to come out of the stock, damaging investors.

54.     The 16% decline in Abercrombie's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Abercrombie's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent

- 17 -

conduct. During the same period in which Abercrombie's stock price fell almost 16% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was essentially flat. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Abercrombie's stock price and the subsequent significant decline in the value of Abercrombie's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Abercrombie publicly traded securities during the Class Period.

58.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Abercrombie publicly traded securities. Plaintiff and the Class would not have purchased Abercrombie publicly traded securities at the prices they

paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

59.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Abercrombie publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

60.     Plaintiff incorporates ¶¶1-59 by reference.

61.     The Individual Defendants acted as controlling persons of Abercrombie within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Abercrombie, and their ownership of Abercrombie stock, the Individual Defendants had the power and authority to cause Abercrombie to engage in the wrongful conduct complained of herein. Abercrombie controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: October 4th, 2005

Brian K. Murphy

GEOFFREY J. MOUL (0070663)
BRIAN K. MURPHY (0070654)
Murray Murphy Moul + Basil LLP

1533 Lake Shore Drive
Columbus, OH 43204
Telephone: 614/488-0400
614/488-0401 (fax)

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1600
San Diego, CA 92101-4297
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Abercrombie 1.doc